UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

WILLIAMS, ERIC R. andCase No. 07-46062
WILLIAMS, LISA R.,Chapter 7
Hon. Walter Shapero

Debtors.

_____/

INSURANCE REPAIR
CONSTRUCTION, CO.,

Plaintiff,

v.Adv. No. 07-06063

WILLIAMS, ERIC R. and
WILLIAMS, LISA R.,

Defendants.
_____/

### **OPINION REGARDING DISCHARGEABILITY OF INDEBTEDNESS**

The matter before the Court is the determination of dischargeability of indebtedness under 11 U.S.C. § 523(a)(2)(A) and (6).

### **I. Background**

On June 11, 2005, a fire damaged a large portion of Eric and Lisa Williams' ("Defendants") home located at 15011 Ward St., Detroit, Michigan 48227 ("Property"). America's MoneyLine, Inc. was the holder of the first mortgage on the Property. Saxon Mortgage Company ("Saxon") was the servicing agent for America's MoneyLine, Inc. Pursuant to the terms and conditions of Defendants' mortgage, Saxon held the fire insurance proceeds in

1

escrow pending the completion of the repairs. The amount of the loss was determined through the efforts of a public adjuster to be $60,468.43.

On September 22, 2005, Insurance Repair Construction, Co. ("Plaintiff") entered into a contract with the Defendants to repair their home. Plaintiff is a corporation owned by James Wilson. Charles Boone ("Boone") worked as a manager, builder, and salesperson for the Plaintiff. Pursuant to the contract, Plaintiff agreed to repair the home according to an agreed upon set of final work specifications for the agreed upon amount of the loss. The contract did not specify a completion date, and final work specifications were to be worked out later.

Plaintiff began the "tear out" phase of the project on September 26, 2005 even though the final work specifications had not yet been formally agreed on. After several revisions, the final work specifications were signed by the Defendants on December 5, 2005. On December 6, 2005, Plaintiff obtained a building permit from the City of Detroit Building and Safety Engineering Department and began construction. Per Plaintiff's request, an initial check in the amount of $18,092.64, payable to both Plaintiff and Defendants, was issued from the escrow account, endorsed by the Defendants, and deposited by Boone on January 5, 2006. Because of what Defendant's perceived as undue delay by Plaintiff, on January 19, 2006, at Mr. Williams' request, Boone drafted and signed a letter that stated: "The estimated date for repairs to be completed at 15011 Ward St., Detroit, Michigan, barring unforseen calamity, is January 30, 2006." On February 2, 2006, as the Plaintiff's crew was completing its last day on the job, Mr. Williams ordered Plaintiff's crew from the Property at gun point. On February 6, 2006, the Defendants sent a letter to Saxon that stated in part:

> This Contractor became hostile, disrespectful, ran past his due date 4 times and
> after several heated confrontations; I was forced to have the local police remove

> him and his team from my residence. My wife and I have taken over the repairs. I was left without a working kitchen, my bathroom was damaged paint all over the flooring and carpets, a plumbing problem, damaged new refrigerator, destroyed and threw away our custom blinds, left plastic on all our windows and countless other things too numerous to list in this correspondence. Please issue the 2nd Draft with my wife (Lisa Williams) and myself (Eric Williams) only on the check.

On February 16, 2006, and possibly unknown to Plaintiff, Saxon issued a check to the Defendants from the escrow account in the amount of $22,615.81. On February 24, 2006, Plaintiff filed a Claim of Lien on the Property in the amount of $42, 375.79 plus all associated costs. On September 27, 2006, Saxon issued another check to the Defendants from the escrow account in the amount of $13,569.49. The last check, representing the escrow and claim balance, in the amount of $6,190.49, was issued to the Defendants, but it was never cashed. At some point prior to the bankruptcy filing, Plaintiff filed an action in state court to foreclose on a claimed construction lien.

## II. Discussion

Defendants initially argue that this case is merely a contract dispute and thus, it does not belong in this Court (they in fact did not argue abstention under 28 U.S.C. § 1334 - and such would have been unavailing if they did). The case here is only whether the debt, if any, should be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and (6). While the Court agrees with the Defendants' assertion that the state court is better suited to hear and decide the liability, if any, and the amount owed to Plaintiff by Defendants, this Court has the authority (indeed the exclusive authority) to determine whether the debt owed to Insurance Repair, if any, is dischargeable under the cited provision. That is all this opinion decides.

While it is not totally clear, the evidence indicates that Boone, and his son, in effect

appeared to be acting as independent sub-contractors from the Plaintiff carrying out the performance of the agreement, for a consideration that they had agreed upon. Regardless, however, of Boone's exact status viz-a-viz the Plaintiff for purposes of this proceeding, the later is the proper and contracting party, and, Boone is and was acting as its agent.

There is an extensive record, some of which is more, or at least as relevant to the issues of whether or not Plaintiff and Defendants breached their agreement and what amount is owed by whom to whom, than to the separate and distinct dischargeability issues. The former, presumably will ultimately be determined by another action in another court. The latter is what follows.

## Section 523(a)(2)(A)

Section 523(a)(2)(A) provides:

> A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) is phrased in the disjunctive. It describes three types of conduct engaged in by a debtor that can give rise to a nondischargeable debt: (1) false pretenses; (2) a false representation; and (3) actual fraud.

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*In re Crim*, 149 Fed. Appx. 427 (6th Cir. 2005) (*citing Rembert v. AT&T Universal Card Servs.,*

*Inc. (In re Rembert)*, 141 F.3d 277, 280-281 (6th Cir. 1998)). "In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence." *Rembert*, 141 F.3d at 281 (citing Grogan v. Garner, 498 U.S. 279, 291, 11 S. Ct. 654, 661 (1991)).

The first element the Plaintiff must prove is that the Defendants obtained money through material misrepresentation that, at the time, the Defendants knew was false or made with gross recklessness as to its truth. "[A] plaintiff must establish a misrepresentation of past or existing fact, or a future promise with bad faith intent not to fulfill the promise at the time it was made." *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F. Supp. 1438, 1444 (E.D. Mich. 1992). Shortly after ordering Plaintiff's crew from the Property, Mr. Williams drafted and sent a letter to Saxon stating:

> This Contractor became hostile, disrespectful, ran past his due date 4 times and after several heated confrontations; I was forced to have the local police remove him and his team from my residence. My wife and I have taken over the repairs. I was left without a working kitchen, my bathroom was damaged paint all over the flooring and carpets, a plumbing problem, damaged new refrigerator, destroyed and threw away our custom blinds, left plastic on all our windows and countless other things too numerous to list in this correspondence.

(Plaintiff's Exhibit No. 5).

Defendants initially argue that, even if these representations were false, they are not actionable because they were made to Saxon, not Plaintiff. The Court disagrees. Saxon was holding the insurance proceeds in escrow, and, in that capacity, it was acting as an agent for both the Plaintiff and the Defendants. *See Smith v. First Nat. Bank & Trust Co. of Sturgis*, 177 Mich. App. 264, 270 (1989) ("An escrow agent is the agent of both parties to the escrow agreement. The escrow agent ceases to be the agent of both parties and becomes the agent only of the party

5

in whom title to the property held in escrow vests when the property has been placed in escrow under an agreement that is to go to that party upon the meeting of a condition and that condition is met." (internal citations omitted)).

Reviewing the evidence, and concluding that the evidence presented on behalf of Plaintiff was more credible, the Court finds the following:

(A) Defendants falsely represented that the Plaintiff ran past the contract's due date four times. The contract did not include a "due" or a completion date. Even though the work commenced immediately, the ability to set or approximate a completion date was impeded largely by Defendants as part of the finalization of the work specifications process. On January 19, 2006, Mr. Boone, on Mr. Williams request, drafted a letter which stated that "[t]he estimated date for repairs to be completed at 15011 Ward St., Detroit, Michigan, barring unforeseen calamity, is January 30, 2006." Boone and his son testified that 99% of the work had been completed by that time and that the Plaintiff's crew was starting its final day on the job when the Defendants ordered them off the premises on February 2, 2006. Boone and his son further testified that the only work then remaining was cabinet installation in the basement kitchen, which Mr. Williams himself requested be held off until after the last City inspection scheduled for February 1, 2006, and touch-ups throughout the home. Defendant's claim that Boone told them that they would be in their home (i.e.: work completed) by Thanksgiving and by Christmas at different points during the construction does not square with the fact that the final work specifications were not signed until December 5, 2005. The Court also finds that the January 30, 2006 due date in the letter dated January 19, 2006 was essentially an estimated completion date that did not and could not have taken into account later circumstances.

6

(B) Defendants falsely represented that they had to have the local police remove the Plaintiff's crew from their residence. The Court concludes that, on February 2, 2006, it was Mr. Williams who ordered Plaintiff's crew from his home by gun point and that Plaintiff's crew called the police in response to those actions.

(C) Defendants misrepresented what remained undone. As noted, the Plaintiff's crew was on its last day on the job when they were ordered from the home. Boone and his son credibly testified that, based on the agreed to work specifications, the basement bathroom was not to be touched. Mr. Boone further testified that the only work that remained to be completed was the basement kitchen and touch-ups throughout the home. The Court finds the fact that the Defendants did not inform the Plaintiff of the alleged deficiencies significant. Based on the credible testimony and the photographs in evidence of the progress of the construction in the home, the Court finds that, even if the Defendants had some legitimate issues with the Plaintiff's work, Mr. Williams exaggerated and overstated the deficiencies and/or undone work (and indeed had not previously brought some of the items to Plaintiff's attention for correction). He did so to the point that, when considered in light of the other statements in the letter and the context of the situation, and an apparent need or desire to reinforce and justify his actions, such should be considered as material misrepresentations. Part of that context, or at least an explanation, may have been certain pressures on the Defendants to move back into their home, regardless of the status of the work under the agreement. To be sure, as is not infrequently the case in construction situations, there may be items at the end that need to be corrected or completed, and such may have existed in this case - but not in the magnitude or importance that Defendants represented.

Next, Plaintiff must prove that the Defendants had "intent to deceive." The Court finds such intent to deceive Saxon. The Defendants knowingly made the indicated misrepresentations to Saxon in order to have the remaining escrow funds released directly to them only. Even if there were some problems with the quality of the construction or there were damages caused during construction, the amounts necessary to remedy such were much too disparate from any correct amount owed to Plaintiff under the contract that this discrepancy, coupled with the total amount owed to Plaintiff under the contract and the context of the recited occurrences, shows ulterior motives and the necessary intent to deceive.

Plaintiff must next prove that Saxon justifiably relied on the Defendants' misrepresentations. Based on the agreement between the parties, the funds in escrow were to be released in phases and the Plaintiff would be entitled to funds when the Defendants were comfortable with the level of progress. Saxon clearly relied on the Defendants' misrepresentations regarding the progress of the construction and the unfinished items and damage caused to the property when it released the funds to the Defendants in their names only. To be sure, a more careful mortgagee and escrow agent might have taken steps to verify what Mr. Williams told them, by contacting Plaintiff for instance, before releasing the funds, or by having the checks payable to both parties and may have been remiss in not doing so. The record does not reveal whether or not such was done. However, that such might be the case does not perforce negate a conclusion of reasonable reliance upon the Defendant's misrepresentations.

Lastly, the Plaintiff must prove that Saxon's reliance was the proximate cause of the loss. This element is clearly met because Saxon released the escrow funds to Defendants only, directly causing the Plaintiff's loss.

Accordingly, the Court finds that whatever another court finds the amount of the debt owed by Defendants to Plaintiff to be, such is nondischargeable under § 523(a)(2)(A).

Section 523(a)(6)

Since the Court find the debt to be nondischargeable under § 523(a)(2)(A) , it is unnecessary to determine the § 523(a)(6) claim.

Plaintiff should present an appropriate order.

```
Signed on December 30, 2009
                                        /s/ Walter Shapero
                              Walter Shapero
                              United States Bankruptcy Judge
```

9